IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WINTON TRANSPORTATION, Inc., | : | Consolidated: |
| | : | Case No. 1:05CV471 |
| Plaintiff | : | Case No. 1:06CV646 |
| | : | |
| v. | : | District Judge Susan J. Dlott |
| | : | |
| PAT SOUTH, in her official capacity as | : | ORDER GRANTING |
| WARREN COUNTY | : | DEFENDANTS' MOTION FOR |
| COMMISSIONER, et al. | : | SUMMARY JUDGMENT AND |
| | : | DENYING DEFENDANTS' |
| Defendants. | : | MOTION TO STRIKE |
| | : | |
| | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (doc. 70),[1]

Plaintiff's Corrected Response to Defendants' Motion for Summary Judgment (doc. 96), and

Defendants' Reply (doc. 89).[2]  Also before the Court is Defendants' Motion to Strike Affidavit

_____

[1] Unless otherwise indicated, all references to the record for this case refer to the docket in Case No. 1:05CV471.

[2] At this time, the Court notes that, for one reason or another, neither Plaintiff nor Defendant felt it necessary to comply with local rules governing page limits for pleadings.  The Court's Civil Trial Procedure Order, which incorporates Local Rule 7.2(a)(3), provides that briefs and/or memoranda filed in support of or in opposition to motions for summary judgment shall not exceed twenty pages absent prior approval of the Court.  This Court also requires all parties moving for summary judgment to file a proposed statement of undisputed facts, "which sets forth in separately numbered paragraphs a *concise* statement of each *material* fact as to which the moving party contends there is no genuine issue to be tried."  Standing Order Governing Civil Motions for Summary Judgment at 1.  The Court further requires the party opposing summary judgment to file a response admitting or denying each proposed fact.  The statement of proposed undisputed facts is not to be utilized as a supplementary statement of facts, but rather a list of those facts referenced in the movant's motion for summary judgment
(continued...)

of Don Berry and Improper Exhibits Attached to Plaintiff's Response to Defendants' Motion for Summary Judgment (doc. 88).  For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES AS MOOT** Defendants' Motion to Strike.

## I.      BACKGROUND

### A.      Procedural History

This case relates to a dispute over the public bidding of a Rural Transit System Contract in Warren County.  Plaintiff Winton Transportation, Inc. ("Winton") was the provider of Warren County's Rural Transit System from 1995 to 2004.  The County rebid the contract in December 2004 and awarded the contract to another company, MV Transportation.  Winton subsequently

---

[2](...continued)

that the movant argues are undisputed.

In the instant case, Defendants appear to have utilized the statement of proposed undisputed facts to circumvent the twenty-page limit set forth in Local Rule 7.2.  Defendants' statement is not, as the Court's standing order requires, a concise statement of the proposed undisputed *material* facts.  Instead it is a general statement of facts spanning twenty-six pages.  As Defendants utilized the proposed statement of undisputed facts to spawn a sprawling description of the allegedly relevant facts, they had no need to include a statement of facts in their memorandum in support of their motion for summary judgment and could devote the whole twenty pages to addressing their legal arguments.  In other words, Defendants essentially filed a forty-six page motion for summary judgment.

Plaintiff, for its part, responded with a response to Defendants' proposed statement of undisputed facts and a twenty page memorandum in opposition to Defendant's motion for summary judgment, both of which on the surface appeared to comply with local rules.  However, upon closer inspection, the Court found that within Plaintiff's twenty page memorandum, it had incorporated a significant portion of its earlier response to Defendants' previous cross-motion for summary judgment (doc. 35).  Thus, Plaintiff's brief measured approximately thirty pages and required the court to navigate two separate statements of the Plaintiff's argument.  Complicating matters further was the fact that though Plaintiff claimed, in its *Corrected* Response to Defendants' Motion for Summary Judgment, to have attached its previous opposition memorandum as Exhibit B, what it actually attached as Exhibit B is a copy of its opposition to Defendants' current motion for summary judgment.  The Court has chosen to overlook these follies rather than strike the parties' briefs, but cautions the attorneys to be more conscientious of the local rules in future proceedings before this Court.

filed suit in the Southern District of Ohio against Defendants Pat South, C. Michael Kilburn, and David G. Young, all in their official capacities as Warren County Commissioners, claiming that the award was invalid and seeking an order directing Warren County to rebid the contract. Both parties thereafter engaged in discovery and eventually filed cross-motions for summary judgment. (Docs. 16, 23.)

Subsequent to the ripening of those motions and the completion of discovery, Winton moved the Court for leave to amend its complaint. (Doc. 51.) With its proposed amended complaint, Plaintiff sought to add Warren County Grants Coordinator Jerry Haddix in his individual capacity and to assert a new claim against the Defendant Commissioners for violation of its First Amendment rights. Due to Plaintiff's delay in seeking leave to amend, and because both parties had already moved for summary judgment as to the original complaint, the Court denied Plaintiff's Motion for Leave to File an Amended Complaint on September 5, 2006. (Doc. 59.) Shortly thereafter, Plaintiff filed a new lawsuit (hereinafter referred to as "Winton II") with this court, asserting essentially the same claims as it raised in its proposed amended complaint. (Case No. 1:06CV646, doc. 1.)

On October 13, 2006, the Court held a conference to discuss the status of the two cases. During this conference, Plaintiff's counsel assured the Court that the claims raised in Winton II were independent and did not overlap with the claims raised in Winton I. However, after reviewing the complaints in both cases and the parties' motions for summary judgment in Winton I, the Court found that common questions of law and fact predominate in these two actions. Accordingly, the Court consolidated Winton I, No. 1:05CV471, and Winton II,

No. 1:06CV646, pursuant to Fed. R. Civ. P. 42(a).  The Court further ordered Winton to file an amended consolidated complaint in Case No. 1:05CV471, and it denied without prejudice the parties' cross-motions for summary judgment.  (Doc. 62.)

On November 2, 2006, Winton filed a Consolidated Complaint (doc. 66) adding a fourth defendant, Jerry Haddix, the Warren County Grants Coordinator, in his individual capacity.  The consolidated complaint alleges, pursuant to 42 U.S.C. § 1983, that the Warren County Commissioners, acting in their official capacity, and Haddix, acting in his individual capacity, unlawfully deprived Winton of a constitutionally protected property interest without due process of law.  The complaint also asserts a First Amendment retaliation claim as well as a claim under Ohio Rev. Code § 307.90 against the Defendant Commissioners.  After Plaintiff filed its consolidated complaint, the Court reopened discovery and set new motion deadlines. Defendants filed their motion for summary judgment on May 15, 2007 (doc. 70), and after a series of filing errors, Plaintiff filed a corrected response on August 6, 2007 (doc. 96).  The matter is now ripe for review.

### B.    Factual History

The Warren County Transportation Service ("WCTS"), which provides subsidized transportation to Warren County residents, has been in service since 1980.  In addition to offering transit services to the general public, WCTS also contracts with agencies such as the Warren County Board of Mental Retardation and Developmental Disability and the Warren County Department of Jobs and Family Services.  The Warren County Commissioners operate WCTS with a combination of county, state, and federal funding.[3]  Warren County does not

---

[3] Because it receives federal and state funding, WCTS must comply with certain federal
(continued...)

directly provide services, but rather contracts with outside providers who essentially run the day-to-day operations and are responsible for hiring all WCTS employees, including dispatchers, drivers, maintenance, and management.[4]

Winton, which does business under the trade names UTS and Universal Transportation Systems, served as the WCTS provider from January 1996 through December 31, 2004 under a series of separate contracts awarded after competitive review and selection.[5]  (Haddix Dep. 24; South Aff. ¶ 3; Kilburn Aff. ¶ 3.)  When Winton's last contract was approaching expiration, the Commissioners resubmitted the WCTS service contract for bidding and solicited proposals for services beginning in 2005 for a contract term of one-year with renewal options for four additional years.  (Haddix Dep. 41, Ex. 6; South Aff. ¶ 4; Kilburn Aff. ¶ 4.)

### 1.        Solicitation and Review of Bids for the 2005 Contract

The procedure for soliciting bids began with a Request for Proposals ("RFP"), which Warren County Grants Administrator Jerry Haddix[6] drafted in consultation with the Ohio Department of Transportation ("ODOT").  (Haddix Dep. 45.)  The Commissioners reviewed the

---

[3](...continued)
and state guidelines governing public transit.

[4] One result of this arrangement is that WCTS employees are not considered employees of Warren County.

[5] During that time, Winton experienced no significant performance problems.  The County's decision to rebid the service contract was merely a matter of course.  (Haddix Dep. 24-25, 30.)

[6] Haddix serves as an intermediary between the Commissioners and ODOT and FTA in procurement matters.  (Haddix Dep. 10.)  Haddix's role in the selection of a transit services provider was limited – he merely reviewed the incoming proposals and provided information to the selection committee and the Commissioners.  He had no authority to reject, rank, or determine the compliance of any proposals, and made no recommendations to the selection committee or to the Commissioners about the proposals.  (Haddix Dep. 63-64, 67.)

draft and authorized publication of the RFP on September 23, 2004.  (Id., Ex. 5.)  On October 5, 2004, the Commissioners obtained permission from ODOT to advertise the RFP.  (Id., Ex. 4.)  Once the RFP was advertised, the County provided copies of the RFP to interested bidders upon request.  (Id. at 60.)  Among those bidders were Plaintiff Winton and MV Contract Transportation, Inc. ("MV") – the company to which the County ultimately awarded the contract.

The RFP included a general project description as well as a description of contractor responsibilities and service requirements.  It also outlined the project schedule and conditions for responding.  (Id., Ex. 6.)  All proposals were to be based on the conditions set forth in the RFP and were to provide the requested information.  (See id., Ex. 6 at 17, ¶1.)  However, the County expressly reserved "the right to accept or reject any or all of the proposals submitted, waive informalities and technicalities, and negotiate any or all elements of the proposals."  (Id., Ex. 6 at 19, ¶ 22.)[7]

With regard to the standard for evaluating proposals, the RFP noted that any resultant "contract will be authorized by ODOT and the FTA and in accordance with the standards and guidelines established by the Warren County Board of Commissioners."  (Id., Ex. 6 at 5.)  As Winton points out, the RFP nowhere explicitly states that the County will adhere to the "lowest

---

[7]In its proposal, Winton expressly acknowledged this reservation of rights:

The undersigned, Martha Tipton, Sr. VP, agrees that the County reserves the right to reject any and all proposals, to waive any informalities or irregularities in the proposals received, and to accept that proposal which is in the best interest of the Warren County Board of Commissioners.

(Haddix Dep. Ex. 11 at 35.)

and best" bidder standard set forth in Ohio Rev. Code § 307.90, the Ohio statute governing the

competitive bidding process.  Instead, the RFP outlines the selection procedures as follows:

> A selection committee appointed by the Warren County Board of Commissioners
> will review and analyze each response.  Proposals will be evaluated based upon
> the following criteria, but not limited to:
> - Preclusion from proposing (Federal, State, local)
> - Proper documents submitted and executed/signed/notarized
> - Meet proposal deadline
>
> Technical Criteria and personnel experience

| | | |
|---|---|---|
| Operations Manager | total available points | 20 |
| Disadvantage Business Enterprise | total available points | 10 |
| Reliability and financial stability of company | total available points | 20 |
| Understanding of the overall project & Organizational structure | total available points | 10 |
| Maintenance approach | total available points | 10 |
| Safety and risk management plan | total available points | 10 |
| Cost | total available points | <u>20</u> |
| | | 100 |

> Interviews and/or negotiations may be conducted with each or any of the
> respondents.  As illustrated, cost will be considered, but is not the determining
> factor for a contract award.  After the interviews or negotiations, Warren County
> will award a contract to the proposer which, in its opinion, has made the best
> offer, with concurrence from the Ohio Department of Transportation.
>
> Warren County reserves the right to accept or reject any or all proposals.

(<u>Id.</u>, Ex. 6 at 14-15.)

All interested bidders had until November 8, 2004 to submit proposals.  Pursuant to the

RFP, responsive proposals included two components: (1) the technical portion, which consisted

of the plan for operation of services; and (2) the cost proposal.  The bidders had to submit each

component in a separate, sealed envelope.  (<u>Id.</u> at 61-62, Ex. 6 at 2.)  Five companies, including

both Winton and MV, submitted proposals.

The Commissioners appointed a three-person selection committee to evaluate the proposals.[8]  (Id. at 66; South Aff. ¶ 5, Ex. 1.)  However, Haddix was actually the first person to unseal and initially review the submissions.  (Haddix Dep. 61-62.)  Just as the proposals were submitted in two parts, the review process was similarly bifurcated.  First, Haddix opened the technical portion of the proposals.  (Id. at 62.)  He reviewed each submission for compliance with the RFP and prepared a review sheet matrix that rated compliance in particular areas with a plus or minus.  (Id. at 63-64.)  In mid-November 2004, Haddix turned the technical proposals and the matrix over to the selection committee.  (Id. at 64; Ferrell-Sauer Aff. ¶ 4; Craig Aff. ¶¶ 4-5; Price Aff. ¶ 5.) The selection committee scored each technical component using the point system set forth in the RFP.  (Haddix Dep. 65, 68; Ferrell-Sauer Aff. ¶ 6; Craig Aff. ¶ 7; Price Aff. ¶ 5.)  Based on their review, the committee members determined that MV and Winton submitted the top two technical proposals.

After the committee members reviewed the technical portions of the proposals, they repeated the process with the cost portions.  (Ferrell-Sauer Aff. ¶¶ 5, 6; Craig Aff. ¶¶ 5-6; Price Aff.  ¶¶ 5-6.)  Winton claims that MV's cost proposal did not conform to the requirements of the RFP in at least three respects.  First, the RFP specified that the bidders were to base their cost proposals on certain figures including a total number of 33,422 vehicle hours.  (Haddix Dep. Ex. 6 at 4.)  For unstated reasons, MV based its cost proposal on a total of 33,000 vehicle hours.  To reconcile this irregularity, Haddix estimated MV's proposed cost for a total of 33,422 hours by calculating the hourly rate and multiplying this by 33,422.  (Id. at 127-28.)  Using the same

_____

[8] The members of the committee were Robert Craig, Tiffany Ferrell-Sauer, and Robin Price.  All three had participated in the review of proposals for transit service in the past. (Haddix Dep. 66.)

8

procedure, Haddix then determined what the other four bidders proposed cost would be at 33,000 hours rather than 33,422 hours.  (Id.)  Haddix included both calculations on the matrix he submitted to the selection committee.  (Id., Ex. 13.)

Second, Winton claims that MV's cost proposal did not account for many of the cost items required by the RFP.  The County included in the RFP a cost summary form that the bidders were to use in their proposals.  This cost summary sheet called not only for a total cost, but also for a break down of that total cost.  In other words, it required the bidder to indicate how it determined the total cost by dividing that total cost into specific operating expenses.  Thus, the form suggests certain expense categories, such as the labor costs for management, dispatching, drivers, and maintenance, and the costs of insurance and advertising.  (See Haddix Dep. Ex. 6 at 33-34.)  In total, the form lists twenty-four expense categories.  The cost matrix that Haddix prepared essentially streamlined the bidders' responses to these criteria into one spreadsheet.  It appears from the matrix that MV did not include an estimated cost for "Advertising/Marketing" or for the "Services" section, which broke down further into the following items: (1) Professional; (2) Technical; (3) Custodial; and (4) Miscellaneous.  (Id.)  While Plaintiff focuses solely on MV's proposal, the matrix indicates that all five of the responding companies, including Winton, neglected to provide a cost estimate for at least one item specified in the cost summary sheet.  (Id.)

Third, Winton argues that MV should have included a "cost allocation plan," but failed to do so.  The RFP specifies that if the bidder planned to use a facility in part for the WCTS contract and in part to provide services under another contract, the bidder must provide a cost allocation plan for the use of that facility.  (Id., Ex. 6 at 34.)  MV indicated in its proposal that it planned to use its facility in Beaver Creek, Ohio to service vehicles used under the WCTS

contract as well as vehicles used under a contract with Greene County. (Id. at 117.) However, MV failed to provide a cost allocation plan detailing how it would split the cost of the facility between the two contracts. (Id., Ex. 21.)

Despite these inconsistencies, the selection committee again found that MV and Winton were the top two bidders. In fact both companies received a score of 87 points. (Ferrell-Sauer Aff. ¶¶ 5-6, Ex. 1; Craig Aff. ¶¶ 6-7, Ex. 1; Price Aff. ¶¶ 6-7, Ex. 1.) Winton contends that MV's score was inflated due to misrepresentations Haddix made to the committee. Whether or not based on accurate calculations, the selection committee ultimately determined that MV and Winton received the same score, and to resolve the tie, the committee elected to interview representatives of MV and Winton. (Ferrell-Sauer Aff. ¶ 7; Craig Aff. ¶ 8; Price Aff. ¶ 8.)

The interviews took place at 9:30 a.m. on December 8, 2004. (Haddix Dep. 166.) At approximately 11:30 a.m. that same day, Haddix forwarded to the Commissioners the selection committee's formal recommendation that the County award the contract to MV. (Haddix Dep. Ex. 20.) The Commissioners concurred in the committee's recommendation that MV offered the lowest cost and the best proposal and that it was in the County's best interest to award the contract to MV. (South Aff. ¶ 7; Kilburn Aff. ¶ 6.) The Commissioners approved the selection committee's decision by resolution at a public hearing on December 21, 2004. That same day, the Commissioners notified MV by letter of its intent to award the contract to MV for the amount listed in its proposal. (South Aff. Ex. 2.) ODOT formally approved the decision by letter on December 23, 2004. (South Aff. Ex. 3.)

### 2. Negotiating the 2005 Contract

Shortly before making the award to MV, concern arose that the Commissioners would not be able to complete the review process in time for the selected company to begin operations by January 1, 2005.[9] (Haddix Dep. 94-95, Ex. 9.) In order to prevent any possible lapse in service, the Commissioners sought ODOT's authorization to extend Winton's 2004 contract for a short period of time. (Haddix Dep. 95; Price Aff. ¶ 4.) After receiving authorization, the County proposed the extension to Winton, but Winton refused to extend its contract. (Haddix Dep. 95; South Aff. ¶ 6; Kilburn Aff. ¶ 5.)

With time being of the essence, almost immediately after the County announced the selection of MV as the new transit provider, the Commissioners and MV entered into negotiations to reach a mutually agreeable contract. Haddix and the County Prosecutor were also involved in the negotiation and review of the final contract, which was approved on December 28, 2004 at a public meeting. The County maintains that the contract negotiations were lawfully undertaken pursuant to the original RFP, in which the County expressly reserved the right to engage in contract negotiations. (See Haddix Dep. Ex. 6 at 19, ¶22.) Specifically, the RFP provided that "Warren County reserves the right to accept or reject any or all of the proposals submitted, waive informalities and technicalities, and negotiate any or all elements of the proposals." (Id.)

During negotiations, MV proposed several changes to the terms contemplated in the RFP. The County attributes several of these concessions to the fact that MV was given very little time to prepare for taking over operation of the transit system, due largely to late notice of the award

---

[9] The RFP set the award notification deadline at December 1, 2004. (Haddix Dep. Ex. 6 at 16.) However, the selection committee's review of the proposals was unexpectedly delayed because of the holiday season and because one committee member was absent.

11

and Winton's refusal to extend its existing contract through the first portion of 2005.  Among the concessions was the County's agreement that it would waive, for a limited period lasting the first three months of the contract, all penalties, defaults, and/or liquidated damages that may have otherwise been imposed for failure to meet performance requirements.  (See Haddix Dep. 222, Ex. 36.)  The County agreed to include a provision in the contract allowing MV to recover all costs associated with the start-up transition, up to $68,329, in the event the contract was cancelled by the County for any reason other than default prior to December 31, 2005.  (Id.)

Other modifications to the terms set forth in the RFP include, but are not limited to:

1.  The inclusion of a nonsolicitation provision under which the County was barred from hiring any MV employees for one year following the termination of the contract (see Haddix Dep. Ex. 36, at 7);

2.  A waiver by the County of the "no indemnification" provision included in the RFP (see Haddix Dep. Ex. 36, at 5);

3.  The inclusion of a clause entitling MV to termination costs in the event the County ever terminated the contract for any reason except the providers default (see Haddix Dep. Ex. 36, at 2, 10).

In addition to the changes the County agreed to make to the actual contract, Winton claims that the County made additional informal concessions that contributed to MV unfairly receiving a better deal than that offered to the bidders in the RFP.  Specifically, Winton points to the fact that for a five-month period at the start of 2005, the County waived its requirement that the service provider procure its own facilities to operate the transit system by providing MV with free parking for WCTS buses.  (See Haddix Dep. 170-73.)  This situation arose after MV had difficulty securing a parking lot.  During the bidding process, MV had represented to the

12

commissioners that it had located a parking lot on Main Street in Lebanon that it planned to lease. However, when MV later tried to secure this lot, it encountered problems with the City of Lebanon's regulatory requirements. Accordingly, the County allowed MV to park the buses on County property for approximately five months until MV was able to secure its own lot. Finally, Winton contends that the County also deviated from the conditions set forth in the RFP by permitting MV to transport WCTS buses to and from its maintenance facility outside of Warren County using fuel supplied and paid for by the County.

### 3.    Continuing Dispute Between Winton and the County

After Winton learned that the Commissioners had decided to award the 2005 contract to MV, Winton contacted Haddix to inquire into the basis of the decision. Winton also sent a letter to then-County Administrator Bob Price, offering to meet MV's bid price and reduce annual incremental increases from 8%, as Winton proposed in its original bid, to 4.9%. When it did not receive a response, Winton then lodged a formal written complaint that was denied without substantive explanation. (Tipton Aff. ¶ 13, Ex. A.) Over the next few months, Winton continued to protest the award of the contract to MV.

Meanwhile, a separate but related dispute arose between the parties regarding Winton's final invoice to the County. Winton claimed that it was still owed a certain amount of money and sued the County in state court. The parties ultimately settled that lawsuit.

Also during the early months of 2005, the contract with MV manifested a number of problems. The problems largely centered around three areas: (1) customer service; (2) system efficiency; and (3) administrative requirements. (See Haddix Aff. Ex. 11.) Winton Claims that Haddix attempted to mask these problems when they first arose by highlighting certain minor

successes and intercepting customer complaints. (See Haddix Dep. 261-64, 304; Berry Aff. ¶¶4-11.) Nevertheless, the Commissioners were aware of the problems and pointed them out to MV after several months of service, publicly declaring that if performance did not improve within a few months the County would not renew MV's contract at the end of 2005.[10] The Commissioners do not appear to have been confident that MV would turn around its performance in time, as evidenced by Commissioner South's November 14, 2005 email stating that he was "ALL in favor of putting this contract out for bid." (South Dep. 84.)

Around that same time, Winton's president, Tom Burer, learned of MV's operational problems from a newspaper article. The article prompted Burer to contact Commissioner Kilburn to request once again that the County either void the MV contract and award it to Winton, or rebid the contract. (Tipton Dep. 253.) Burer claims that Commissioner Kilburn stated that because Winton had filed several lawsuits against it, the County would choose to run the transit service itself before rebidding it. (Burer Dep. 78; Tipton Dep. 253.) Commissioner Kilburn does not recall making this statement, but does not discount the possibility that he and Burer discussed the lawsuits. (Kilburn Dep. 40.) Instead, he recalls telling Burer that he felt it was important for the Commissioners to honor the County's contract with MV and to try to work out the problems. (Kilburn Dep. 39.) Along the same lines, Winton also alleges that Haddix told a former transit employee who had quit after MV took over operations that it would be a "cold day in hell" before the contract was rebid. (Christy Aff. ¶ 7.)

The Commissioners publicly discussed MV's status at a January 3, 2006 Commissioners' meeting. Prior to the meeting, Haddix and David Gully, the new County administrator, provided

_____

[10] The 2005 contract included, consistent with the RFP, renewal options for four years beyond 2005. (See Haddix Dep. Ex. 36.)

14

the Commissioners with a report of MV's performance and made recommendations regarding whether or not the County should renew the contract. The official transcript of the January 3, 2006 meeting indicates that the transit contract issue took up a large portion of the meeting. Approximately one-half of the transcript, starting at page 26 and continuing through page 56, relates to discussion of the contract and MV Transportation's performance. (See doc. 70, Ex. J1, Tr. of Commissioners' Meeting, Jan 3, 2006.) As indicated therein, the discussion began with Haddix reporting the status of MV Transportation's operations, focusing on what, if any, improvements the transit company had made since the last meeting. (See id. at 27-32.)

Following Haddix's report, a representative of MV spoke and answered questions about the company's attempt to analyze and address ongoing problems. (See id. at 32-48.) The representative indicated that MV had entered into a long-term lease for, and had invested its own resources in, a maintenance and parking facility for WCTS vehicles in Warren County. Among other things, he also indicated in response to the Commissions' recommendations regarding MV's staff that MV had reassigned its General Manager away from Warren County and promoted long-time Warren County residents and transit employees to management type positions, including scheduler and safety manager. (Id. at 33-35.)

Commissioner Kilburn brought up the instant litigation, expressing concern about whether the Commissioners should consider the lawsuit before deciding whether or not to renew MV Transportation's contract.[11] (Id. at 48-49.) Commissioner Young then made an official motion to go into executive session. (Id. at 50.) When the Commissioners returned from the

---

[11] According to the official minutes of the January 3, 2006 meeting, Commissioner Kilburn requested an executive session to "discuss pending litigation relative to the complaint from Winton Transportation as it relates to the agreement with MV Transportation." (Doc. 85, Ex. A.)

session, Commissioner Young stated on the record, "For the record, I think it's important to note what we talked about, that it was essentially how any type of a contract extension would affect our pending litigation." (Id. at 52.) Commissioner Young then stated that they were ready to "discuss moving forward with . . . [the] contract," made a motion to extend MV Transportation's contract, and stated his reasons for supporting the extension:

> COMMISSIONER YOUNG: I can make a motion to – to extend this contract for (inaudible) because that does a couple of things in my opinion, it essentially gives certainty to our constituents as to continuation of service and, number two, and just as important, it gives them some continuity to the actual drivers so that they know what's coming down the pike and, you know, that another company's not going to come down and be employing them or are they going to lose their jobs in six months. So with that said, I would also like to inform the – the folks at the company here that I think we're still all of the notion of this – we don't want to use the word probationary, but you guys are, you know, on the job, you know, performance every day, that you're (inaudible) a job interview. You know, if the level of complaints rises or the bus drivers have an – you know, as Commissioner Kilburn says that the indians revolt against the chiefs, you know, there's going to be a problem.
>
> And it's just the rebidding process takes three to six months anyway, so it wouldn't be fair to say, you know, here's a six-month extension simply because we would be bidding this starting in 30 days or something, so – and, you know, that wouldn't be fair to you guys that we are impressed with – with, you know, you listening to us and saying, you know, let's take some folks that are in the system, let's forget about this complicated, you know, new scheduling software that has worked in other areas, but doesn't necessarily work here when, you know, you've got a fairly well-oiled machine that's been working. Just use that model.

(Id. at 52-54.) Commissioners Kilburn expressed similar sentiments, stating:

> COMMISSIONER KILBURN: And I concur. It gives the employees some – some sense of security and its also fair to MV with their renewed spirit of wanting to succeed and wanting to provide this good service. I don't think six months would be fair to you to do that. I think one year will be – prove some footing, you know, that could eventually turn into a multi-year contract if everyone's happy with the service and you're happy with your job to be done here and (inaudible) operations, successes will continue, then hopefully that will be all of your goals. So I'll second Dave's motion to extend for one year.

(Id. at 54-55.) South concurred with the motion, and the Commissioners voted to extend MV Transportation's contract for another year.

## II.    LEGAL STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." Id. at 252.

## III.   DISCUSSION

As indicated above, Winton asserts the following claims: (1) 42 U.S.C. § 1983 procedural due process claims against the Warren County Commissioners, acting in their official capacity, and Haddix, acting in his individual capacity; (2) a First Amendment retaliation claim against the Defendant Commissioners; and (3) claims under Ohio Rev. Code § 307.90 against the Defendant Commissioners.  Defendants move for summary judgment as to all claims.  The Court construes all official capacity claims against the Commissioners as claims against the County.  See Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); Leach v. Shelby County Sheriff, 891 F.2d 1241, 1245 (6th Cir. 1989) ("A suit against an individual 'in his official capacity' has been held to be essentially a suit directly against the local government unit and can result in that unit's liability to respond to the injured party for his injuries.").

## A.    Procedural Due Process

42 U.S.C. § 1983 creates a private right of action against anyone who, under color of state law, deprives an individual of "any rights, privileges, or immunities secured by the Constitution or laws of the United States."  Blessing v. Freestone, 520 U.S. 329, 340 (1997); 42 U.S.C. § 1983.  Section 1983 does not itself create any rights but merely provides a mechanism for enforcing individual rights "secured" elsewhere.  Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002).  In the instant case, Winton seeks to protect its procedural due process rights rooted in the United States Constitution. The Due Process Clause of the Fourteenth Amendment provides that no state "shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.  "Procedural due process rules are meant to protect persons

18

not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978).

To establish a procedural Due Process violation, Winton must prove: (1) the existence of a protected property interest, (2) a deprivation of that property interest, and (3) that state remedies for redress of the alleged deprivation were inadequate.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985); Hudson v. Palmer, 468 U.S. 517 (1984); Hahn v. Star Bank, 190 F.3d 708, 716 (6th Cir. 1999) (quoting Vicory v. Walton, 721 F.2d 1062, 1066 (6th Cir. 1983)).  Defendants argue that Winton's procedural due process claims fail as a matter of law because Winton fails to establish a constitutionally protected property interest and cannot show that state remedies for redress of the alleged deprivation were inadequate.  Additionally, Defendants argue that neither the County, nor Haddix, individually, is liable under § 1983 for any actions taken by him in connection with the public bid.

### 1.      Protected Property Interest

Winton claims it has a constitutionally protected property interest in its bid for the 2005 transit contract. The Sixth Circuit has in the past "refuse[d] to adopt [the] argument that the mere submission of a bid under a discretionary award procedure is sufficient to create a legitimate claim of entitlement to the award." Peterson v. Ohio, No. 89-3347, 1989 WL 143563, at *2 (6th Cir. Nov. 29, 1989) (unreported opinion).  However, in United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 34 (6th Cir. 1992), the Sixth Circuit recognized that under certain limited circumstances an unsuccessful bidder may have a constitutionally protected property interest in the award of the contract.  To prove the existence of such a property interest, the bidder must show that: (1) it was awarded the contract at any procedural stage and then the award was

19

revoked; or (2) the state official had limited discretion as to whom the contract should be

awarded and abused that discretion.  See Enertech Electrical, Inc. v. Mahoning County

Comm'rs, 85 F.3d 257, 260 (6th Cir. 1996).

Winton does not allege that it was awarded the contract at any stage in the selection

process.  Instead, Winton claims that Ohio Rev. Code § 307.90 limited the County's discretion as

to whom it could award the contract and that the County abused this discretion by failing to

award the contract to the "lowest and best bidder."  Ohio Rev. Code § 307.90 states in relevant

part, "The award of all contracts subject to sections 307.86 to 307.92 of the Revised Code shall

be made to the lowest and best bidder. . . . The contracting authority may reject all bids."

Interpreting § 307.90 to grant local governments broad discretion in awarding government

contracts, the Ohio Supreme Court has held that "when the statute provides for the acceptance of

the lowest and best bid the [county] is not limited to an acceptance of merely the lowest dollar

bid."  Cedar Bay Constr., Inc. v. City of Fremont, 50 Ohio St. 3d 19, 552 N.E.2d 202, 205 (1990)

(citations omitted).  Rather, the statute "places in the hands of the [county] authorities the

discretion of determining who under all of the circumstances is the lowest and *best* bidder."  Id.

(emphasis added).  Because this discretion is vested in the contracting authority rather than the

courts, "the courts cannot interfere in the exercise of this discretion unless [the contracting

authority] abused its discretion or acted fraudulently."  Enertech, 85 F.3d at 260 (quoting Wilson

Bennett, Inc. v. GCRTA, 67 Ohio App. 3d 812, 588 N.E.2d 920, 925 (1990)); see also Miami

Valley Contractors, Inc. v. Montgomery County, No. 15477, 1996 WL 303591, at *1 (Ohio App.

2 Dist. June 7,1996.) (unreported opinion) ("In Ohio, [§] 307.90 provides a Board of County

Commissioners with considerable discretion in selecting the "lowest and best bidder," and as

20

best we can determine, this jurisdiction has never recognized a constitutionally protected property interest of a disappointed bidder on a public works contract.").

Consequently, Winton can establish a constitutionally protected property right only if it shows that the County abused its substantial discretion in awarding the WCTS contract to MV. "In this context, an abuse of discretion implies an unreasonable, arbitrary or unconscionable attitude. Arbitrary means without adequate determining principle; . . . not governed by any fixed rules or standard. Unreasonable means irrational." Enertech, 85 F.3d at 260 (internal citations and quotations omitted). Winton cites several aspects of the bidding process that it claims amounted to abuse of discretion sufficient to create a property right, each of which is discussed below:

### a. Lack of Objective Criteria

Winton first alleges that the County abused its discretion by failing to apply any discernable or objective criteria to evaluate the proposals. According to Winton, the County arbitrarily declined to follow Ohio Rev. Code § 307.90's "lowest and best" standard, and instead "applied some other, unannounced, standard." (Doc. 35 at 12.) Winton relies heavily on Haddix's testimony that because the County received federal funding for the transit services, it had to apply the federal procurement standard of "most responsible firm"[12] rather than the

---

[12] This standard apparently comes from the October 1, 2004 Federal Transit Administration ("FTA") Master Agreement and FTA Circular 4220.1. (See doc. 70, Exs. N, O.) Defendants argue that because the WCTS was funded in part through a FTA grant, as noted in the RFP, the selection process is not solely governed by Ohio Rev. Code § 307.90, but also by the standards set forth in the FTA Master Agreement. The Court need not address which standard takes precedence or determine how these standards work in conjunction with each other as the County's selection criteria comport with both standards. Indeed, the standards are similar in all material respects; namely, both accord the County wide discretion and neither requires the County to select the lowest bidder, but rather require a "best value" determination based upon a

(continued...)

standard of "lowest and best bidder." (Haddix Dep. 42-43.) Defendants contend that the precise label Haddix applied to the County's selection criteria is immaterial because the County's evaluation and ultimate decision was nonetheless consistent with Ohio law. In other words, Defendants claim the selection committee's actual review process fit well within either of the standards, both of which accord the County discretion to choose the "best" proposal.

After evaluating the County's RFP and selection procedure, the Court finds that the standards the County applied to the selection of a service provider were well within the ambit of § 307.90 and did not amount to an abuse of discretion. First, Plaintiff's allegation that the County applied no discernable or objective criteria in selecting the award recipient is patently false. As described above, the RFP specifically describes the overall evaluation process as well as the point system the County applied for rating each proposal based on specific disclosed criteria. The criteria set forth in the RFP take into account both cost and other factors related to the company's ability to perform the contract. The evaluation process was divided into two parts, with the committee members considering cost and technical ability to perform the contract separately. In other words, the committee members attempted to discern the "lowest and best" proposal.

Second, Haddix's testimony aside, the general standard of review set forth in the RFP closely tracks the language of § 307.90. The RFP describes the selection standard as follows:

> As illustrated, cost will be considered, but is not the determining factor for a contract award. After the interviews or negotiations, Warren County will award a contract to the proposer which, in its opinion, has made the best offer, with concurrence from the Ohio Department of Transportation.

---

[12](...continued)
variety of possible considerations.

Warren County reserves the right to accept or reject any or all proposals.

(Haddix Dep. Ex. 6 at 15.) This language fully conforms with Ohio courts' interpretation of §

307.90 as vesting local governments with wide discretion in awarding the contract to the best

bidder.

Finally, Winton argues that the County did not actually apply the criteria set forth in the

RFP, but rather selected MV based on some unannounced factor. In doing so, Winton claims

that MV was not the lowest bidder. The Court is unclear as to how Winton reaches that

conclusion. The evidence shows that MV did indeed make the lowest bid, whether its cost

proposal is considered based on a 33,000 or 33,422 hour calculation.

Winton additionally claims that the County cannot identify its ultimate reason for

choosing MV over Winton after determining that the overall numerical score of the two

contractor's bids were tied. According to the Defendants, the selection committee rated each

proposal based on the criteria set forth in the RFP. The committee considered cost to be an

important factor, but also evaluated each of the other criteria and for several reasons determined

MV's proposal to be the best offer. First, MV proposed a slightly lower cost than did Winton.

(Ferrell-Sauer Aff. ¶ 8; Craig Aff. ¶ 9; Price Aff. ¶ 9.) The Defendants specifically cite Winton's

proposed cost increases over the four year option period, pointing out that Winton's figures were

higher than the figures that MV proposed. (Ferrell-Sauer Aff. ¶ 8; Craig Aff. ¶ 9.) Winton

counters that prior to the interviews, it requested a copy of MV's cost proposal, but the County

refused to provide a copy. (See Haddix Dep. 183-84.) Winton claims that had it been able to

view MV's proposal, it could have lowered its own cost proposal to provide a more competitive

bid. Haddix confirmed that the County denied Winton's request to see MV's proposal, but

23

claims that it did so on the basis of the RFP, which states that the bids do not become public information until after completion of the selection process.[13] (Id.) In any case, Winton has not shown that it was entitled to view the competing proposals.

Winton argues that the committee members and the Commissioners gave conflicting testimony about the decision. However, the Court has reviewed the relevant testimony and does not find their statements to be inherently inconsistent. To the contrary, the committee members rather consistently indicate that while cost was not a deciding factor in their decision, it was important, that they believed that the time had come for a change, and that MV had suggested more creative ideas for improving service. (See Craig Dep. 21-23; Price Dep. 18-19; Sauer Dep. 19-22; Craig Aff. ¶¶ 8, 9, 11, 13; Price Aff. ¶¶ 8, 9, 11, 13; Sauer Aff. ¶¶ 8-10, 12.) Along the same lines, the Commissioners indicated that they believed MV was the lowest and best bidder, was qualified, dependable, and able to do the job, and was willing to enhance service and performance and to provide the Warren County residents with the service they desired. (See South Aff. ¶¶ 7, 16; Kilburn Aff. ¶6.) None of these considerations implicate factors or standards independent from the specific criteria set forth in the RFP.

Winton latches onto a statement that Haddix made in a 2006 email indicating that the reason the County chose MV was because Winton had been providing too much flexibility to its drivers. (See Haddix Dep. 321.) However, Haddix also testified that he did not recall anyone else sharing this opinion, suggesting that this was not, in fact considered by either the selection

---

[13] The RFP states that "All proposals and supporting documents become public information after the completion of negotiation and a Service Provider has been selected, unless confidentiality is specifically requested and justified by the proposer." (Haddix Dep. Ex. 6 at 14.) Elsewhere, the RFP states, "All proposals and supporting proposal documents become public information after award or rejection of all proposals and are available for inspection by the general public." (Id. at 17.)

24

committee or the Commissioners.  (Id.)  Indeed, Haddix was never, at any point during the
County's review of the proposals, a decision-maker.  Instead, he submitted information about the
proposals to the selection committee, which in turn made a recommendation to the
Commissioners.  There is absolutely no evidence that Haddix has any basis to testify as to the
Commissioners' ultimate reasons for awarding the contract to MV.  Accordingly, statements
such as that highlighted above – an offhand comment made two years after the selection process
purporting to explain the County's motivation for awarding the Contract to MV – do not create a
material issue of fact.

In support of its position, Winton cites to Dayton, ex rel. Scandrick, v. McGee, for the
proposition that the absence of a clear standard is an abuse of discretion.  67 Ohio St. 2d 356,
423 N.E.2d 1095 (1981).  In Scandrick, Dayton decided not to award a public contract to the
lowest bidder, favoring instead another bidder who was a city resident.  The unsuccessful lowest
bidder brought suit claiming that Dayton abused its discretion in favoring the resident bidder
because the bid specifications stated nothing about the contractor's residency being a
consideration. The Ohio Supreme Court found the use of this unannounced standard an abuse of
discretion. Dayton, ex rel. Scandrick, 67 Ohio St.2d at 360-61, 423 N.E.2d at 1097-98.
Scandrick is inapplicable to the instant case for several reasons.  First, in this case, MV was the
lowest bidder.  Second, as addressed above, there is no evidence that the County based its
decision on any criteria not expressly stated in the RFP.

**b.      Waiver of MV's Non-Compliance with the RFP**

Winton next argues that the County abused its discretion by waiving the following
irregularities in MV's proposal: (1) that MV based its cost proposal on 33,000 total vehicle hours

rather than the 33,422 hour figure set forth in the RFP; (2) that MV failed to supply cost estimates for certain expense criteria set forth in the RFP; and (3) that MV did not provide a cost allocation form with its initial proposal, as required by the RFP.   Winton acknowledges that the RFP expressly states, "Warren County reserves the right to . . . waive informalities and technicalities" (Haddix Dep. Ex. 6 at 19, ¶ 22), but argues that, under Ohio law, the County cannot legally reserve this right.   Contrary to Winton's assertion, the Ohio Supreme Court has held that where a local government expressly reserves such rights it does not abuse its discretion in waiving initial irregularities.  Cedar Bay Const., Inc. v. City of Fremont, 50 Ohio St.3d 19, 21-22, 552 N.E.2d 202, 206 (Ohio 1990); but see  Rein Construction Co. v. Trumbull County, 138 Ohio App.3d 622, 741 N.E.2d 979 (Ohio App. 2000) (holding that the county defendant abused its discretion by allowing a bidder to submit a "clarification" letter that amounted to a material and substantial deviation from the county's bid specifications).

Even where a request for proposals includes a similar reservation, the question to be asked in each case is whether the irregularities in the disputed bid are material:

> Bids for public contracts must conform in all material respects to the contract specifications. Not every deviation from the specifications will, however, constitute a deviation that renders the bid nonresponsive.  So long as a bid complies with the specifications in all material respects, and contains no irregularities which give one bidder a competitive advantage over others, the bid will be deemed responsive, notwithstanding the omission of an item called for by the specifications.  Thus, for a bid to be rejected as nonresponsive, the deviation must both be substantial and provide the bidder an advantage over his competitors.

Kokosing Constr. Co. v. Dixon, 72 Ohio App. 3d 320, 328, 594 N.E.2d 675, 680 (Ohio App. 1991);  see also  Rein Construction Co., 741 N.E.2d at 985.

The irregularities the County chose to waive in this case were not material. Winton focuses mainly on the fact that MV proposed a total cost based on 33,000 hours rather than the 33,422-hour figure set forth in the RFP. Winton claims that because of this irregularity and other related cost issues, MV's overall cost was actually higher than Winton's, and the Commissioners based their decision on a mistaken belief as to the overall cost that MV had proposed.[14] As to the total cost proposal, the County waived this irregularity by calculating the cost per hour for each proposal and then determining what each bidder's total cost would be for 33,000 hours of service as well as 33,422 hours per service. Under each calculation, MV's total proposed cost was the lowest. Winton claims that the cost matrix that Haddix prepared for the selection committee was misleading in that the "Total Cost" row listed MV's bid based on the 33,000 hour calculation, while every other bidder's total cost was based on the 33,422 hour calculation. (See Haddix. Dep. Ex. 13.) However, just below that row, the Matrix also listed each bidder's total cost at both 33,000 hours and 33,422 hours. Accordingly, the cost matrix is not substantially misleading. Additionally, Winton presents no evidence that any of the committee members based their decision on an erroneous misunderstanding of the total proposed cost.

Winton also claims that the committee did not adequately investigate or consider the cost that would result from MV's plan to service vehicles at its Beaver Creek, Ohio facility. According to Winton, this arrangement resulted in additional cost because, unlike Winton, MV had to drive the vehicles a significant distance outside of Warren County to service them.

---

[14] Winton relies on Ohio Asphalt Paving, Inc. v. Board of Commissioners of Coshocton County, No. 2:05-CV-0336, 2005 WL 1421952 (S.D. Ohio June 17, 2005), a case in which another court in the Southern District of Ohio found abuse of discretion where the award of a public contract was based on a mistaken belief about material requirements due to the prevailing bidder's misrepresentation and the receipt of misinformation from ODOT.

27

Defendants counter that the committee compared this plan with Winton's practice of using its maintenance facility in Monroe, Ohio and determined that MV's plan would not result in significant fuel cost increases. (Haddix Dep. 228-30; Ferrell-Sauer Aff. ¶ 9; Craig Aff. ¶ 10; Price Aff. ¶ 10.) In any case, such costs would have already been factored into MV's total proposed cost, and thus did not alter that figure.

As for the next allegedly material nonconformity, Winton points to the various cost estimates that MV left out of its proposal. As described above, the RFP required each bidder to provide a breakdown of costs for approximately twenty-four different expense categories, and MV omitted to provide a figure for five categories. These omissions would only materially effect the validity of the overall proposal if subsequent to winning the contract MV raised its proposed cost or failed to provide certain services to account for the omissions. Plaintiff offers no evidence of this. To the contrary, the omissions were immaterial because the winning bidder was nonetheless bound to provide all of the services specified in the RFP at the total cost that the bidder proposed. (Haddix Dep. 154.) Moreover, to the extent that Plaintiff argues the County should have rejected the proposal due to these inconsistencies, the Court notes that MV was not the only company that failed to account for all of the required cost items. None of the five proposals included a projected cost for every specific item. Winton, for example, did not provide an estimated cost for fuels and lubricants. (Haddix Dep. Ex. 13.) It is entirely possible that where each company chose to omit estimates for specific items, it did so because the cost of those items was already figured into another category. Indeed, that is how Haddix interpreted the omissions. (Haddix Dep. 154.)

Likewise, MV's failure to submit a cost allocation plan for the shared use of its maintenance facilities under both the WCTS contract and the Greene County contract was similarly immaterial because the omission did not effect MV's total cost proposal. (See Haddix Dep. 198, 202.) Additionally, Defendants point out that Winton similarly failed to include a required cost allocation plan in its initial proposal. (Haddix Dep. 65.) Nor did the fact that the selection committee allowed MV to correct this omission give MV any discernable or apparent competitive advantage.

### c. Post-Award Negotiations

Winton next claims that the County abused its discretion by engaging in post-award negotiations with MV that resulted in material changes to the terms set forth in the RFP. The Court is unaware of, and Winton fails to identify, any precedent for a continuing property interest in a public bid that extends beyond the decision of to whom the contract should be awarded. Winton relies heavily on an Opinion of the Ohio Attorney General stating that, under Ohio's competitive bidding laws, a public body may not extend a contract subject to competitive bidding for an additional five-year term not contemplated in the original RFP. Ohio Attorney General's Opinion No. 89-064, 1989 WL 455402. This opinion states nothing about whether such modifications amount to an abuse of discretion under Ohio Rev. Code § 307.90. Nor does it suggest that an unsuccessful bidder has any property right in this context. The Sixth Circuit has previously held that "the failure of a governmental body to follow a given procedure does not create a property right. More specifically, the Seventh Circuit has stated that in the absence of an underlying property interest, the Due Process Clause does not require states to obey their

own procedural rules in awarding municipal contracts." Willie McCormick, 61 Fed. App'x at 956 (internal citations and quotations omitted).

Courts have addressed challenges to negotiations that occurred after the bids were opened but *before* any award was made. In those cases, the courts have generally held that where, as in this case,[15] the governing body expressly reserved the right to conduct such negotiations, there has been no abuse of discretion. See Charlie's Towing & Recovery, Inc. v. Jefferson County, Kentucky, 183 F.3d 524, 528 (6th Cir. 1999).[16] Even if Winton had identified a continuing property interest, the Court would nonetheless find that the negotiations between MV and the County did not materially or erroneously alter the terms of the RFP. Post-award negotiations, as Winton recognizes, are often necessary and occur at various points during any given contract term to address unforseen events. For example, in the 2005 Contract, several of the changes made to the terms proposed in the RFP stemmed directly from the fact that the County was giving MV only eight days to prepare to assume control of operations, and foresaw that it might be difficult for MV to become fully operational and make a smooth transition within that short of a window. Other post-award concessions, such as the County allowing MV to park the WCTS vehicles for free in a lot owned by Warren County for five months, related to unforseen problems that arose when MV took control of WCTS operations. There is no evidence or precedent suggesting such negotiations are an abuse of discretion under Ohio Rev. Code § 307.90.

---

[15] The County explicitly reserved the right, in the RFP, to "negotiate any or all elements of the proposals." (Haddix Dep. Ex. 6 at 19 ¶ 22.)

[16] Winton argues that Charlie's Towing is inapplicable because it does not apply Ohio law. The Court finds, however, that Charlie's Towing *is* sufficiently analogous and notes that in Willie McCormick & Assoc. v. City of Detroit, 2003 WL 1465513, 61 Fed. App'x 953 (6th Cir. March 19, 2003), which dealt with Michigan law, the Sixth Circuit applied the premise discussed above from Charlie's Towing, which dealt with Kentucky law.

30

### d. Haddix's Manipulation or Distortion of Competitive Bidding Process

Winton finally argues that Haddix used his position to manipulate and control the selection process and that the County failed to adequately investigate his representations to the selection committee and Commissioners. Defendants, citing <u>Leatherman v. Tarrant County Narcotics and Intell Coord. Unit</u>, 507 U.S. 163, 166 (1993) and <u>Monell v. Dept. of Soc. Serv.</u>, 436 U.S. 658, 691 (1978) for the proposition that a municipality cannot be held liable under 42 U.S.C. § 1983 under a theory of respondeat superior or simply because an employee deprived an individual of constitutional rights, argues that the County cannot be held liable for any wrongful acts Haddix is alleged to have committed.

As Defendants suggest, a city or municipality may be "liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 385 (1989). Respondeat superior is not available as a theory of recovery under § 1983. <u>Monell</u>, 436 U.S. at 691. Therefore, a plaintiff seeking to subject a city or municipality to § 1983 liability for the actions of its employees must show that the employee was acting pursuant to an official policy or custom of the municipality. <u>Bd. of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 403 (1997). Alternatively, a municipality "may be liable under § 1983 for a single decision by its properly constituted legislative body – whether or not that body had taken similar action in the past or intended to do so in the future – because even a single decision by such a body unquestionably constitutes an act of official government policy." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986). Accordingly, to the extent that Winton seeks to hold the County liable for Haddix's actions, Winton must show that Haddix was either a final policymaker or that he acted pursuant to official policy or custom of the County.

31

There is no evidence to indicate, and Winton does not argue, that Haddix is in any manner a final policymaker.  Instead, Winton argues that Warren County ratified Haddix's behavior by failing to adequately investigate Winton's objections and formal protest of the award of the WCTS contract to MV.  Indeed, a municipality may ratify the acts of its employees–and thus subject itself to § 1983 liability – if it fails to meaningfully investigate alleged constitutional violations.  See Otero v. Wood, 316 F. Supp. 2d 612, 627-28 (S.D. Ohio 2004) (holding that "evidence that a municipality inadequately investigated an alleged constitutional violation can be seen as evidence of a policy that would condone the conduct at issue").

Plaintiff presents little to no evidence regarding the nature of the investigation, if any the County took after Winton lodged its formal complaint.  However, the Court need not determine the extent to which the County may be found to have ratified Haddix's conduct, because the Court finds that Haddix took no action amounting to an abuse of discretion.  The Court has already indirectly addressed several of the disputed acts above.  For instance, as to Haddix's role in allegedly misrepresenting MV's proposed cost to the selection committee, the Court has determined that MV did indeed propose the lowest cost and that Haddix's recalculation of MV's proposed cost at 33,422 operational hours was not arbitrary or erroneous.

Winton claims Haddix was responsible for several other material misrepresentations, beginning with its allegation that Haddix misrepresented Winton's past performance as the WCTS provider by describing its performance as merely "satisfactory."  (See Haddix Dep. 32, 36-37, 106-07, 162.)  According to Winton, it actually had high customer satisfaction and had always exceeded the service requirements of its contract at no extra charge to the County.

32

However, Winton fails to show that these are the only two criteria Haddix was to consider in offering his assessment of Winton's performance.  In fact, Haddix testified that Winton's ridership was static and that its efficiency was not optimal.  (See Haddix Dep. 107-108.)  In any case, that Haddix chose to describe Winton's service as satisfactory is not abuse of discretion.  Winton may quibble with the precise adjective used to describe its performance, but the fact that it would perhaps prefer "excellent" over "satisfactory" is irrelevant.

Winton next alleges that Haddix misrepresented that Winton's bid did not include a cost allocation plan, when in fact, it did, and that Winton's proposal included similar "deadhead miles" to its maintenance facility as did MV's.  (Doc. 35 at 13.)  Again, Winton fails to demonstrate abuse of discretion because it does not show that it actually did submit a cost allocation or that the committee members took this into consideration when determining whose bid they should recommend to the Commissioners.  Similarly, as to the "deadhead miles," Winton claims that it had designed its routes to minimize extra mileage that resulted from transporting the vehicles for maintenance purposes, but offers no evidence that Haddix's assessment of the "deadhead miles" under either Winton's or MV's proposal was patently incorrect.  Instead, the evidence shows that the selection committee evaluated this aspect of each bidder's proposal and determined that it was not a significant factor in its decision.

In a somewhat perplexing move, Winton next argues that Haddix purposefully denied Winton access to the other bids and claims that if it had seen those bids it would have been able to explain the alleged deficiencies in MV's proposal.  As indicated above, Haddix confirmed that the County denied Winton's request to see MV's proposal, but claims that it did so on the basis of the RFP, which states that the bids do not become public information until after completion of

the selection process.[17] (Id.) Considering the fact that Winton appears to have taken the stance that any deviation from the RFP, no matter how small, is an abuse of discretion, the Court cannot understand why it now suggests the County should have ignored this particular clause in the RFP.

Not for lack of trying, Winton points to no evidence of abuse of discretion. Instead, the evidence indicates that the Commissioners' decision to award the contract to MV was neither arbitrary nor irrational, but rather was based on a careful consideration of proposals submitted by each bidder based upon the factors set forth in the RFP. As Winton fails to demonstrate the existence of a constitutionally protected property interest, its § 1983 procedural due process claims are hereby dismissed.

### 2. Inadequate Remedy of the Alleged Due Process Violation

Because the Court has held that Winton does not have a constitutionally protected property right, the Court need not address whether Winton has an inadequate remedy under Ohio law. See Curtis Ambulance of Florida, Inc. v. Bd. of County Comm'rs of the County of Shawnee, KS., 811 F.2d 1371, 1375 (10th Cir. 1987) ("The process requirement necessary to satisfy fourteenth amendment procedural due process comes into play only after Plaintiff has shown that it has a property or liberty interest.").

### B. First Amendment Retaliation

---

[17] The RFP states that "All proposals and supporting documents become public information after the completion of negotiation and a Service Provider has been selected, unless confidentiality is specifically requested and justified by the proposer." (Haddix Dep. Ex. 6 at 14.) Elsewhere, the RFP states, "All proposals and supporting proposal documents become public information after award or rejection of all proposals and are available for inspection by the general public." (Id. at 17.)

The Court turns now to Winton's First Amendment retaliation claim.  With this claim, Winton alleges that the County retaliated against it for protesting the award of the 2005 WCTS contract to MV and for filing the instant lawsuit by refusing to rebid the transit contract for the 2006 term.  According to Winton, the Commissioners' decision to renew MV's contract at the end of 2005 resulted at least in part from a desire to prevent Winton from bidding for the contract.  Defendants respond that Winton lacks standing to bring this claim because it has not suffered any actual injury and that even if it has standing it cannot prove a prima facie case of retaliation.

To establish standing, Winton "'must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).  The injury must be "'distinct and palpable' rather than abstract, conjectural, or hypothetical" in order to confer standing.  Id.  For purposes of a First Amendment retaliation claim, an injury is sufficient to confer standing for purposes of a retaliation claim if it would "likely chill a person of ordinary firmness from continuing to engage in that constitutionally protected activity."  Bloch v. Ribar, 156 F.3d 673, 678-81 (6th Cir. 1998).

In the instant case, Winton's claimed injury is the loss of an opportunity to compete for the transit contract in 2006.  Despite Winton's assertion that the County's decision to renew MV's contract rather than reopen it for public bidding "has an obvious chilling effect," Winton fails to show that this decision amounts to an actual injury as Winton had no right to submit a bid in the first place.  The County was under no obligation to rebid the WCTS contract for 2006.  As Defendants point out, MV's 2005 contract contained options for subsequent contract renewals in

35

2006, 2007, 2008, and 2009.  These options were entirely consistent with the 2004 RFP, which provided for bidding and award of "a one (1) year contract with a renewal option for four (4) additional years per mutual agreement."  (Haddix Dep. Ex. 6 at 5.)

Winton fails to point to, and this Court is unaware of, any precedent suggesting that a potential bidder suffers an injury when a municipality lawfully chooses to exercise an option to renew an existing public contract rather than rebid it.  In the procedural due process context, courts have held that potential bidders have no property interest stemming from a public body's decision not to submit a contract to competitive bidding.  See TriHealth Inc. v. Board of Commissioners, 347 F. Supp. 2d 548, 558 (S.D. Ohio 2004).  As a potential bidder lacks any protected interest in the mere opportunity to compete for a contract, it necessarily follows that the loss of this opportunity does not amount to an actual injury.

Because the Court finds that Winton lacks standing to assert a First Amendment retaliation claim, it need not address the merits of the claim.  However, the Court notes that if it were to reach the merits, the claim would nonetheless fail for the same reasons that it lacks standing.  Specifically, Winton would be unable to demonstrate that it was subjected to an adverse action or deprived of some benefit, as is required to make out a prima facie case of retaliation.  See Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003).

**C.      State Law Claims**

As the Court has dismissed all of Winton's federal claims, it declines to exercise jurisdiction over and dismisses without prejudice Winton's remaining state law claims.  See 28 U.S.C. § 1367(c)(3).

**IV.     CONCLUSION**

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary

Judgment (doc. 70) as to all of Plaintiff's federal claims and dismisses without prejudice

Plaintiff's state law claims.  The Court additionally **DENIES AS MOOT** Defendants' Motion to

Strike (doc. 88).

IT IS SO ORDERED.


                                        ___s/Susan J. Dlott_____
                                        Susan J. Dlott
                                        United States District Judge